Your Honors, the first case of the morning, call 209-1061, People's State of Illinois v. Markey v. Thomas, on behalf of the Avalanche, Mr. Kim Robert Fawcett, on behalf of the Avalanche, Mr. Richard Lund. Mr. Fawcett. Good morning, Your Honors. Kim Fawcett representing Markey Thomas. With the Court's permission, I'd like to begin with a brief review of the reasonable doubt issue, which is Issue 1, but my focus today would be on Issue 2, the hospital security tape that was relevant to the alibi offense that did not go back to the jury room. And particularly, the mid-deliberation request by the jury to see the security videotape, which the trial court denied and called the jury to continue deliberations. This is a case of unreliable in-court eyewitness identification. There were only two witnesses who made an in-court identification. Neither of these witnesses said that the shooter wore short pants, but they identified my client as the shooter. On the hospital security videotape, my client is seen wearing short pants, and this was taken shortly after the shooting. Did anybody say your client was wearing long pants? There was testimony by a lady whose name was Nikita who said that the shooter was wearing black jeans. The other lady didn't say – she said she wasn't looking down, although she knew the victim wore a black jacket. No one said that – anything more than that about the lower half of the man's body. But it's a discrepancy, and – Counsel, I can't see your pants. Would you please move around so I can see them? I just want to be able to identify you if I ever see you again. Yes. Okay, thank you. You're wearing long pants. I'm wearing long pants today, Your Honor. The dispatch was at 926, so the shooting was sometime before 926, correct? That's correct. And the videotape at the hospital was 939. Well, you deduct a minute because to make the two numbers work out, you have to deduct a minute from the hospital security tape. There was a stipulation, so it's 938. And there was some testimony that it took about six to eight minutes to drive there. The State's rebuttal witness on Friday morning, the last day of trial, said it took him seven or eight minutes consistently from Ms. Key's apartment to get to the hospital emergency room door. But remember, the testimony by the witnesses who had the shooter running to the southwest and getting into a car going north and the shooter running to the southeast and getting into a car going south, under the State's theory, they would have to drive around to Ms. Key's apartment first. Then they would have to go, according to her testimony, to the front door of the hospital, park the car, get out of the car, go through the door, try the door. The door didn't work. Then she said they went around to the rear of the hospital. So when they arrive at 838, it is 12 minutes there between the dispatch of the first officer at 926 and 938 when they get to the rear door of the hospital. But they had to go to the front door, and they had to stop and pick up these two ladies, Ms. Key's and Damari, somebody. It was all based on defense witnesses' testimony, correct? I'm sorry? It was all based on defense witnesses' testimony? Well, I have a tape, because the tape corroborates a lot of Ms. Key's testimony. She says that the three people come in, the four people come in. One is Tavares Daniels, who is known to this record as Four Pumpkins, and that was his car. Doesn't Ms. Key ultimately say, though, she didn't leave the house that night? No. Her first – everybody who talked to the police in this case gave a first statement, which they later disavowed. Ms. Key said that she was not out of the house that night. But then they talked to her about the security videotape, because they had been talking to my client, among others, and they got the hospital security tape, Detective Harris. And when they confronted her with the hospital security tape, she said, yeah, we went to the hospital to see this fellow who was in the hospital. There is a real person who was in the hospital. His name is in the record. I don't recall it. So what my point is, on the 12-minute period between the time the first officer is dispatched until 8.38, covers when they arrive at the emergency room door at the back of the hospital. They first went to the front door, according to her testimony, and they also had to stop at her house if they were doing this. Now, remember, Nikita is the one who said that the shooter ran to the southeast and got in the car that went south, and she said the driver was Tommy Moore. So that means if they're driving for Pumpkin's car, Mr. Daniel's car, they have to switch drivers, too. So there's a lot of ifs in there about – there's a lot of doubt, and there's a lot of short – there's a foreshortened period. It's not a full 12 minutes, so it's unlikely that he could have changed pants. But I want to emphasize that the two witnesses who made the in-court IDs were inconsistent on their pretrial statements about headwear. They talked about these two cars. They both said it was for Pumpkin's car, but one said it made noise, one said it didn't make noise. And they had it going in different directions. There's a – But all this was argued to the – presented to the finer fact and argued to the finer fact. Yes. Yes, Your Honor, and it is important because of the defense of misidentification and alibi. And even if this evidence is not insufficient, it is certainly a close case. This is not a case of overwhelming evidence. The jury had a lot of difficulty with the credibility questions and with these other discrepancies for the in-court identifications. And I would say that the jury was struggling with the case when they asked on Friday afternoon, they asked for the videotape. They asked to see the videotape. And that leads me into the second issue, if I may, which is the ruling on that bid trial – bid deliberation request. Now, the jury had not seen that tape that day. They saw the tape Thursday afternoon, but this was Friday. Friday began with the state's rebuttal testimony that attempted to measure the seven or eight minutes to the emergency room door from the Chief's apartment. Then there was closing arguments, and then there was deliberations. In the closing argument, defense counsel said, ladies and gentlemen, remember the videotape. You saw my client on the videotape. He looked according to – he looked happy and energetic. He did not look nervous. He was wearing shorts. A little later he said, and the hospital videotape shows what he looked like that night. He said Ms. Keyes said he was always happy and energetic. In fact, he was hitting on this girl sitting to his left, this blonde lady on his left. That's what counsel said. The jury may not have looked at his demeanor on Thursday. They may have been looking at something else. I don't know what. But now they're told by defense counsel on Friday afternoon, look at my client's demeanor. In essence, he's saying, this is not a guy who just committed a murder. Just look at him. And the jury got to that point in their deliberations. They wanted to look at the tape. They asked to see the tape. The issue was preserved because defense counsel wanted to send the tape back at the beginning of deliberations. He said, alternatively, if the jury asked for it, let's send it back then. How long had the jury been deliberating? I don't know. It was, what, 12, 25. I believe it was 12, 25 when the closing arguments began. But I don't recall any other time reference in the record. So I don't know. Was this plain error? Well, I think it's preserved. I thought it was preserved error, Your Honor. It wouldn't be plain error because it's a closely balanced case, and we need to use a plain error review. It's a closely balanced case on misidentification and alibi. The judge's ruling was, I don't want to overemphasize one item of evidence. And that was the state's position. And basically, we think that that's an error there because the test should be, well, is the item of evidence, transcript or exhibit, helpful to the jury? Is it relevant to an issue in the case? And is it substantially prejudicial? Well, the jury thought this was helpful, so it would be helpful to the jury. It's certainly relevant to the alibi offense, maybe the misidentification offense. But it's certainly a relevant piece of evidence. And there's no prejudice in the tape. If you look at the tape the jury saw five minutes, the tape is, the whole tape is substantially longer than that. I forgot how long it is. I've seen the whole tape. It just shows people in a hospital emergency room. That's it. The state never made a specific argument about prejudice. They just said overemphasis. You cite a lot of cases in your brief that show that it's not an abuse of discretion to send exhibits back. Do you have any case law in Illinois that you found where it was an abuse of discretion to not send exhibits back? I cited the Queen case, which held it was an abuse of discretion for the judge not to send the transcript back. Of course, in that case, the judge said, I can't send transcripts back. And the court said it was a blanket ruling about trapezoid. Blanket ruling. No recognition of discretion. And there is the De Rossette case, which is the fourth district case I cited in my brief, where the officer's direct testimony was sent back, but his cross-examination testimony was not sent back. And that case reversed because the cross-examination testimony was not sent back. It was a kind of balancing or fairness approach since the officer's direct testimony supported the state's theory. But nothing about exhibits. I mean, transcripts, I mean, we couldn't possibly distinguish transcripts from exhibits. Yes. Transcripts may tend to highlight a witness's testimony or an exhibit. Maybe it's arguable that it wouldn't so much. Yes, there are. There are some important distinctions between transcripts and exhibits. But the crowd here said this is just like a transcript. So the ruling is based on the analogy of transcripts. However, the Gomez case, which is in the refinery, the state's brief, ruled that it was not prejudicial error to refuse to send back the two photographs of the broken door. But, you know, had it been prejudicial, then it would have been error to not send them back. I don't have any other cases. Those are the three cases that I can identify. In terms of the transcript versus the exhibit, the problem with overemphasis of a transcript is that a jury could misconstrue the written word or construe it differently than it was spoken in open court. And so there's always a risk that when you give a jury the transcripts, they're going to arrive at some inaccurate reading of what the spoken word was. That's not true with a photograph or a tape, which is a series of photographs. Was there any expert testimony about how people act after they allegedly shoot somebody twice in the head? No, Your Honor. There was no testimony about demeanor one way or the other as far as general testimony. Well, how do you rationalize the claim of defense counsel that look at the tape, determine whether he looks nervous or whatever? I'm having a problem conceptualizing or understanding how looking at a tape 10 or 15 minutes later is supposed to give anybody some indication of what somebody has done 15 minutes prior. I listened to a lot of evidence over my career, and I was admitted to the bar in 69. And I frankly, I'm not aware of any suggestion that you can determine guilt or innocence based upon how someone acts in a non-confining situation, meaning under arrest or in custody, as indicia of lack of guilt or innocence or guilt. Well, the state never objected to the defense lawyer's closing argument on that point. The defense lawyer said, well, first of all, the defense lawyer said, look at him, he's energetic and happy, he doesn't look nervous. The jury then responded. I think the jury responded to that argument. Notice that the state made arguments in their rebuttal also about the tape, but they said they told the jury to rely on recollection. I think if the jury decides to emphasize that, then they do. Well, I know that the instruction says something about using your common everyday experiences in life, but my comment on everyday experiences in life would suggest that the demeanor of the defendant could be elation over the fact that he had just shot someone who supposedly he was getting revenge on. So I don't know how to read this. I don't see how any trier of fact could take any or make any conclusion or come up with an inference based upon how this person is acting. Now, if he's saying I got that mother or something like that, that might have some basis in, you know, some relevance or materiality. But I'm questioning your argument about how this is so prejudicial when I don't see how what this person's persona was other than his identity or possibly what kind of pants he was wearing or his hairstyle or whether he was wearing a do-hat or whatever they're called. I just can't accept your argument that this is probative to the extent that it's prejudicial. Well, I think that the only answer I can give you is that the tape itself is relevant to the alibi defense. The jury made a request to see the tape. My take on the record is that the jury was asking to review that demeanor argument. But we don't really know why the jury wanted to see the tape. That's my take on it. But remember the defense, the prosecution argued in its rebuttal that the officer was dispatched at 12, 9, 26, and they arrived at 8, 38 at the emergency room. And maybe the jury was responding to the timeline argument. Just so that I appear to be fair, if he had acted nervous, I wouldn't have considered that indicia of guilt either. So my point is I don't know how you can determine guilt or lack thereof based upon how someone is acting without listening to what they're saying. And if they don't say anything incriminating, then I don't see the relevance or materiality of what his persona is or how he's acting at the time. It doesn't prove anything one way or the other. There's no audio on the tape. It's just pictures. So the question would be if the jury was looking for demeanor, it could be that they related that to misidentification, taking the opposite inference. But we don't know what the jury was asking for. The question is was the tape relevant to the defense? Yes, it was. Did the jury think it was helpful to them? Yes, they did. Could the judge say it was helpful to the defense? Yes, he could. Therefore, the only real question is was it substantially prejudicial to the state? Otherwise, it should come in. Did defense counsel argue an opening statement about, we're going to see a videotape of my client wearing shorts and no one's going to identify him wearing shorts? You know, if the jury was clued in to the shorts issue before they viewed the videotape? Your Honor, I don't recall the opening statements. However, during Ms. Keyes' testimony, defense counsel asked Ms. Keyes after the tape was shown, can you describe what you see in the tape? And the state objected and said the tape should speak for itself. So also, the judge never told the jury, you know, you should study that tape because I'm not going to let you see it later. They just saw five minutes in the courtroom. So given those two things, I think if the jury says, we know from its request that it is putting emphasis on that tape. So we're already past the point of placing emphasis on one item of evidence. The jury's question indicates they've already done that. The only real value here is the accuracy of the jury's memory. Are we going to serve the jury and let the jury get to the bottom of the case? And that's really what this is about. And the judge's ruling was an abuse of discretion because it was unreasonable not to give the jury what it was asking for when it needed it. And the judge's ruling stymied the jury's effort to get to the bottom of the case. That was the jury's only note, though, wasn't it? They didn't come back later and say we can't decide the case because we didn't see the videotape. I believe there's only the one note. I don't recall, frankly, I don't think there was any other note. And I don't know how long they deliberated after that. But it was important to the jury to ask. The jury asked. The test was is it helpful, is it relevant, and is it too prejudicial? The judge never applied that test. The judge said it was overemphasis. We know the jury already placed the emphasis. Therefore, the only question is the accuracy of the jury's memory. The judge should have sent the tape back when the jury asked for it to assure that the jury could find out what it was looking for, which we don't actually know what they're looking for. I think your time is up, sir. You have a chance for a vote. I sit down. Thank you very much. I'll be asking for a new trial case on Issue 2, if not the reversal of the right. Thank you. Mr. London. Your Honors, Counsel, may it please the Court, Richard London, on behalf of the people of the state of Illinois. Your Honors, the two issues that defense discussed were the reasonable doubt in the admission or lack thereof of the video. Both issues really boil down to the concept of how important it is that the defendant was seen on a video sometime after the murder and the dispatch of the officer wearing short pants and his demeanor. The people would argue that there's no relevance. As Justice McClaren jokingly asked counsel to step back, I could step back in probably about 10 seconds, take my pants off, if that was necessary. You don't have to, Counsel. I've certainly not gotten that suggestion, or I'm not planning on doing so. I was actually going to ask that question, but I was afraid it might get out of hand. Yes, I definitely would not plan on doing so. We were actually joking yesterday about taking those snap-away pants and then pulling them off. If, indeed, this was a planned alibi, which appeared to be the people's theory, that the defendant did this and went to the hospital to be seen on videotape, that would be very easy for a defendant to just have shorts worn underneath, if, indeed, that's the case. Or two, again, I don't know about your honors. I can probably change out of pants and into shorts in 30 seconds to a minute tops. The defendant wasn't driving the car. So in the six to eight minute time frame, that would have been more than sufficient. The people's objection to the tape going back to the jury at least appears to be some type of prejudice. What's the prejudice involved in the jury seeing that tape? I'm not sure prejudice as much as confusion. They said there's just so much different stuff on the tape that the jury could have been confused as to exactly what was going on. I'm not completely sure. I necessarily agree that it would have been overly prejudicial. But that's not what the deciding factor is. The deciding factor is did the judge properly decide to send it back? Did the judge make a correct decision? And two, more importantly, even if error, is it prejudicial? And the people would suggest that, one, to be honest, we don't agree that it's preserved. Defense counsel did acquiesce. The fact that he initially requested that the tape be sent to the jury doesn't equate to an objection once the jury later requested it. The jury said, you know, sent out a note saying we'd like to see the video. Defense counsel's first response was let's give a response saying that, you know, you have everything in front of you. Is that sufficient? Because he then later stated, well, you know, of course our preference would be it goes back. Is that sufficient to lodge an objection? I don't believe so. He stated a preference. Does that rise to a level of objection? Again, the state obviously has argued that the defendant acquiesced by doing so. But most importantly, the issue boils down to two factors. One, even if error, is the defendant prejudiced? Well, under the case law, what you need to look at is the length of the trial, the complexity of the issues, when the video, when the evidence was viewed. It was a two-day trial. As counsel suggested, this was viewed probably late, one of the last things that happened, if not the last thing that the jury saw on Thursday. What's your response to Justice Burke's question of Mr. Fawcett relating to opening statements or any indication by the defense that they were told up front what they were going to see and what was relevant and material about that? Since the defendant didn't raise that issue, we didn't brief it, but my recollection is that there was no mention in opening statements. Again, I wouldn't bet my life on it, but the recollection of the people is that there was no reference in opening statements. So it is raised, and again, let's make it clear. Counsel is given broad discretion to argue in closing argument. So the jury sees the video, last thing on Thursday. Friday morning, counsel is allowed to get up and make an extensive argument as to what the video showed, in his recollection, what the importance of the video is. And it boils down to the same thing. The video shows you that defendant wore short pants, and the video shows that defendant, you know, did not appear to be someone that would have just shot someone. He's happy. He's allegedly flirting. I'm not sure without voice how that impression has gotten other than maybe the video shows a defendant, you know, chatting with someone else. I take it the State's argument admitted that the defendant was wearing short pants. State certainly did. Is that why they brought in the witness in rebuttal to show how much time it took and the person could have changed their pants? I'm not sure exactly why, but that's, you know, conjecture and probably logical why they showed the time frame. But the State didn't contest either of those. The State didn't contest that the video showed defendant wearing short pants. The State didn't contest that defendant had a relatively, you know, happy or pleasant demeanor at the time. And the State agrees that this is a tape from the hospital and the time stamp is fine. The State agrees it's a surveillance video from the hospital. The parties stipulated to the time stamp. We would disagree with counsel or defendant's assessment that it would have taken more time because defendant had to run one way or another, get into a car, drive to the witness's house, pick up the two women. Again, no reason to believe that everyone was not already in the car. Defendant didn't run to the car and the car immediately proceeded to the hospital. But the testimony does show the reason why the officer that testified as to the time from the location of the shooting to the hospital was six to eight minutes was because the officer took two separate routes. He testified he took the most direct route, which took approximately six minutes. And then he also took the route that the defense witness suggested that they took. And even under that time, it only took eight minutes. That was driving the speed limit of 30 miles an hour, stopping at all stops, stopping at all traffic signals, not going faster, which, again, obviously we don't know that evening how the car defendant was in drove. The fact is there was at least 12 minutes from the time of dispatch until they're seen on the videotape. When I say time of dispatch, we don't know. There is no testimony between the time of the shooting, the call to 911, and then the dispatch. You would have to assume you would add at least a minute or two, if not more. But there's absolutely no testimony. So you have 12 minutes from the time of dispatch. You add at least another minute or two. So you have 12 to 14 minutes minimum, which is more than sufficient for a defendant to take off, change clothes, et cetera. Two of the eyewitnesses said that the defendant went north. The other said south. And I think they also said different streets, did they not? They said different streets. It's not completely clear. One said it sounded like they headed in one direction based on their hearing what they identified as the distinctive sound of Phil Pumpkin's car. And, again, yes, there were discrepancies. The discrepancies as to which direction the defendant headed after shooting is, we would argue, minor. It would potentially change, again, the time frame from leaving the scene to getting to the hospital. But that was extensively argued to the jury. Those discrepancies were pointed out. And the jury just, you know, established that that didn't impact them. Were these people located in such positions that if the person ran to the north, they would be running away from one of the witnesses who theoretically or practically speaking would not be able to make a good ID? Your Honor, I honestly don't know as far as once the defendant started running, whether or not they would have been able to see or how they would have, you know, how clearly they would have been able to see them. But all three witnesses testified that they identified the defendant while he was still at the body. And they clearly saw him, that there was a hoodie, but one witness said the hoodie, you know, came down. The other witness that did not identify defendant in court but had made pretrial identifications. And even while she stated in court that she couldn't identify anybody, she acknowledged that her earlier statements identifying defendant were true. And the third who looked out of the window, they all saw defendant clearly at the time. I honestly don't have a recollection of after defendant ran if they would have been able to see him then. But no one suggested that that's when they identified him. It wasn't after. Was there evidence that these people knew the defendant? There was evidence that at least one of the witnesses knew defendant previously. The other testified it's not clear if she had seen defendant around the neighborhood. But the second testified that she had seen him quite a bit after the murder. And that he was basically staking out her place and had allegedly threatened her. Did Ms. Penny testify that she knew the defendant beforehand? Ms. Penny didn't testify that she knew defendant, did or didn't know defendant beforehand as far as I can recall. And of course, Ms. Penny was the one witness that stated she couldn't identify defendant in court. Although she had both identified him previously and picked him out of the lineup. Of course, she was the individual that suggested that she had been beaten and threatened. You know, clearly was afraid to not testify in court. But again, as I stated, identified him as the individual that she had identified previously and said that statement was truthful. As far as demeanor, Justice McClaren questions that. The people would definitely question the issue of demeanor. Not only does demeanor not necessarily establish anything, absent words. But there's nothing to say that, again, if this individual had carried out a retaliation for a gang issue. Which peripherally, the individual referred to in issue four in this case had suggested was the circumstance. It is not inconceivable that he would have had a smile. He would have been boasting. And that would have been something that he had a positive demeanor. Because he did what he was supposed to do. He carried out a gangland slaying. Again, most importantly, the question is one. Defendant almost wants to suggest a per se rule. If the jury requests something and if it is relevant and could help them, it must go back. That's not the rule. The rule is. The judge is supposed to. Abuse of discretion. The rule of the test is an abuse of discretion. And did the judge abuse his discretion going back? And if it was error, is the error prejudicial? The error can't be prejudicial because of the lack of complexity of the trial. The timing of when the video was shown. The fact that the issues were relatively minor. And most importantly in this particular case. The only thing, even assuming the jury was allowed to review this tape. The only things that could have shown were what defense counsel argued at trial. One, that he was wearing short pants on the video, which people don't contest. And two, that his demeanor was, again, relatively. One wouldn't expect of someone that had just shot and killed somebody. During the course of this trial, were there enlarged maps of the area showing the streets that everybody is talking about? Going north, going south. Your Honor, I honestly don't recall. I know it was definitely discussed. I don't know if the record is clear as to what displays were made. The people also want to briefly mention the fact that the reason why the people didn't comment more specifically. Relating to what the video looked like was the video wasn't included in the record on appeal. It was subject to a motion to supplement the record. And that motion was granted by this court. However, it wasn't there when the people prepared their filing. So we can get the look at it. But again, most importantly, there's nothing on that that would have shown or been so relevant or important that could or would have changed the jury's mind. Defense counsel was able to totally argue his points. The people did not contest them. And the jury, you know, was aware of the discrepancies, aware of the fact that the defendant had short pants. Arguably, and I state that pretty emphatically, arguably was not wearing short pants at the time. Because again, as the defendant acknowledges, two of the three witnesses didn't comment on what he was wearing. One did suggest he was wearing short pants, sorry, long pants at the time of the shooting. And again, even if that is accurate, certainly there's nothing to suggest that defendant could have changed out of that. Counsel did not extensively argue in closing relating to the hair, the do-rag or the lack thereof. It was simply short pants and demeanor. For these reasons, we ask the Honorable Caller to affirm the decision of the lower court. Thank you. Thank you. To answer your question, Justice Hutchinson, People's Exhibit 2 was an area map. It was a large area map. Did that go back to the jury? I don't recall if it went back, but it was prominently displayed in the courtroom. It was on that map that shows Garden Court Street, let's say, to the east. If this is the central walkway and Birch Court Street is over here to, I'm sorry, to the east and that's west. So, you know, the one witness said that the shooter ran this way southwest and got into a car, which she heard sound like Fort Pumpkin's car, and went up this way, which is Buckby Street and 15th Street. Ms. Keyes says they're going west to east on Buckby Street when she hears shots and they turn on Kishwaukee and go up to the hospital. The trial was four days. It started with a jury selection on July 21st, and they had evidence the 22nd, 23rd, and the morning of the 24th. It was not a two-day trial. It was two and a half of evidence. So the issue of preservation, defense counsel started out by saying send it back to them when they retire, but if not, alternatively, if they ask for it, send it back to them. He never varied from that position. When the jury came out with a no, he made a comment. It's in my brief. It's in my reply brief, basically saying, well, we stand on our prior objection, but if you're going to use this language, this language is okay with us. He was not waiving the prior objection, and he thought he preserved it because he put it in his post-trial motion. It's a fully preserved issue. Let me ask you this question. If we were to determine that the demeanor of your client on the video was irrelevant, and that argument was irrelevant, then is there still prejudice involved here where the state does not contest that this was a hospital video, didn't contest the timing on the video, didn't contest that it was the defendant on the video, and didn't contest that the defendant was wearing shorts on the video? Is it still prejudice if we take out the demeanor argument? The jury wanted to know where the car was parked. She said they parked the car at the front door. They parked the car. They got out of the car. They went to the front door. They tried to open the front door. They couldn't open it. Then she said they went around to the back of the car. So the jury wants to know, is there anything on the video outside of that five minutes that shows the car at the front? Well, there's not. Is there anything on the video that shows the car parked in the rear parking lot, meaning they drove from front to back? Well, there's not. But the jury wanted to know that, and they decided the case not knowing that. That could be an exploration of the timeline that would be important. Beyond that— Well, maybe the jury didn't believe there might have been a real friend there, but who goes to a hospital at 939 at night to visit somebody? Well, you know— That's another question the jury could have asked. I know from the police report it's not in the record, but there was a real person in the hospital. I don't know. No one made a record of what hospital visiting hours are. Is it possible that you have 24-7 visiting hours? You know, I can't testify. My dad's in a hospital. It would seem like that. You have crazy hours. Is it possible the jury wanted to know that question and wanted to see demeanor related to that question? So what was going on? And you can see Mr. Daniels in the back of the video. They come on this door this way. My client comes down the hallway, sits right in front of the camera with his back to the camera, and he's talking to this lady. The other three are at the desk talking to the nurse. They're trying to see somebody. They were told—the testimony was they were told they couldn't—they weren't allowed to go up with them. Now, maybe they used bad judgment and maybe they didn't call ahead, but they were at the desk asking the question. So if that was the jury's question, the tape would have been helpful to Mr. Thomas. The bottom line here— Maybe they were coming to see if the victim had gotten there yet. That's another possibility. Well, again, it's a supposition by the state that this was a planned alibi. It's a supposition by the state that clothes were changed. There's no testimony about clothes being changed. And Ms. Keys was on the stand, and she was with everybody all day. You know, Mr. Daniels, Mr. Daniels' sister, Erica, who's the victim's girlfriend, my client, this lady, the marionette, and Ms. Keys. And they're all together hanging out all day. The inference I can make is that the guy put on shorts during the warmth of the day, and he forgot to change for the cool of the evening. And he wore shorts all day. Nobody said anything about shorts in the state's witness. Not even Ms. Penny was standing next to Mr. Nunn when he was shot, and she got grazed. She made a statement. She made two different pretrial statements. So the jury had—one was that it's not my client, and one was that it was. In court, she didn't identify anybody. So the jury had a really tough time here with these witnesses. The credibility was very much at issue. The whole idea was about inconsistent statements. If they're inconsistent, you can't believe them. The jury wanted to get to the bottom of the case. The jury needed to see this videotape. For whatever purposes it wanted, it wanted the tape. The judge should have given it the tape. It was unreasonable not to. It boils down to saying we're never going to give the jury what it wants because the evidence was admitted into evidence. It was published to the jury, and it was argued in closing argument. Under that kind of a rule, the jury never gets it. There cannot be an abuse of discretion. The better rule is if the jury wants it, they should get it unless it's too prejudicial. Any other questions? Thank you. Time is up. The case will be taken under advisement. There will be a short recess. Thank you.